**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

STATE OF NEW MEXICO,

        Plaintiff,

vs.                                Civil Action No.

THE PUEBLO OF ISLETA,
a federally recognized Indian tribe,
THE PUEBLO OF SANDIA,
a federally recognized Indian tribe,
THE PUEBLO OF TESUQUE,
a federally recognized Indian tribe,
THE SANTA CLARA PUEBLO,
a federally recognized Indian tribe,
THE SAN FELIPE PUEBLO,
a federally recognized Indian tribe, and
THE SANTA ANA PUEBLO,
a federally recognized Indian tribe.

        Defendants.

**COMPLAINT FOR BREACH OF CONTRACT**

**COMES NOW**, the State of New Mexico ("State"), by and through undersigned counsel, and for its Complaint against the Pueblo of Isleta, Pueblo of Sandia, Santa Clara Pueblo, Santa Ana Pueblo, San Felipe Pueblo, and Pueblo of Tesuque (hereinafter "Tribes") hereby alleges as follows:

**NATURE OF THE ACTION**

This is a lawsuit brought by the State to recover money owed to the State by the Tribes as a result of the Tribes: (1) taking deductions not permitted by the 2007 Tribal-State Class III Gaming Compact ("2007 Compact"); or in the alternative, (2) having failed to include the value of non-cashable electronic Free Play credits ("Free Play credits") used by patrons in the same

1

manner as a monetary wager on a Gaming Machine, when calculating "Net Win" as defined by Section 11 of the 2007 Compact.

The State and the Tribes subsequently entered into the 2015 Tribal-State Gaming Compact ("2015 Compact") which included provisions that allowed the State two (2) years to bring suit to collect unpaid revenue owed, by the Tribes to the State, under the 2007 Compact.

## THE PARTIES

1.     The State is a sovereign State of the United States of America, having been admitted to the Union pursuant to the Act of June 20, 1910, 36 Statutes at Large 557, Chapter 310.  The State has not waived its immunity to suit in federal court and does not waive such immunity from suit with respect to any claim or counterclaim that may be asserted against the State by the Tribes in this action.

2.     The State is authorized by its constitution to enter into contracts and agreements, including the 2007 Compact and the 2015 Compact with each of the Tribes.

3.     The Tribes are sovereign federally recognized Indian tribes located within the State of New Mexico.

4.     The Pueblo of Isleta's governing body has authorized officials of the Pueblo of Isleta to enter into contracts and agreements, including the 2007 Compact and the 2015 Compact between the State and the Pueblo of Isleta.

5.     The Pueblo of Sandia's governing body has authorized officials of the Pueblo of Sandia to enter into contracts and agreements, including the 2007 Compact and the 2015 Compact between the State and Pueblo of Sandia.

6.     Santa Clara Pueblo's governing body has authorized officials of Santa Clara Pueblo to enter into contracts and agreements, including the 2007 Compact and the 2015 Compact between the State and Santa Clara Pueblo.

2

7.     Santa Ana Pueblo's governing body has authorized officials of Santa Ana Pueblo to enter into contracts and agreements, including the 2007 Compact and the 2015 Compact between the State and Santa Ana Pueblo.

8.     The Pueblo of Tesuque's governing body has authorized officials of the Pueblo of Tesuque to enter into contracts and agreements, including the 2007 Compact and the 2015 Compact between the State and the Pueblo of Tesuque.

9.     The San Felipe Pueblo's governing body has authorized officials of the San Felipe Pueblo to enter into contracts and agreements, including the 2007 Compact and the 2015 Compact between the State and the San Felipe Pueblo.

## JURISDICTION AND VENUE

10.     Jurisdiction over the State's claims is proper under 28 U.S.C. §§ 1331, 1367(a) and 25 U.S.C. §§ 2701, 2710(d), including but not limited to 25 U.S.C. §§ 2710(d)(7)(A)(ii).

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a) and (c).

## BACKGROUND

12.     In 1988, Congress enacted the Indian Gaming Regulatory Act, P.L. 100-947, 25 U.S.C. § 2701 et seq. (hereinafter "IGRA"), which defines the terms under which federally recognized Indian tribes may conduct gaming on "Indian Lands."

13.     Under IGRA, federally recognized Indian tribes may only conduct Class III gaming that is allowed by the State on "Indian Lands" and pursuant to a gaming compact agreed to by a state and a tribe or procedures promulgated by the United States Secretary of the Interior.

14.     The Tribes jointly participated in negotiation of the 2007 Compact with the State, and each and every one of the Tribes agreed to the terms of the 2007 Compact that was jointly negotiated between the State and the Tribes.

3

15.     The Tribes jointly participated in negotiation of the 2015 Compact with the State, and each and every one of the Tribes agreed to the terms of the 2015 Compact that was jointly negotiated between the State and the Tribes.

16.     The 2007 Compact entered into between the State and each of the Tribes are identical in all respects, with the exception of the name of each Tribe, the name of the persons executing the 2007 Compact on behalf of each Tribe, and the name of the person approving the 2007 Compact on behalf of the Department of the Interior.

17.     The 2015 Compact entered into between the State and each of the Tribes are identical in all respects, with the exception of the name of each Tribe, the name of the persons executing the 2015 Compact on behalf of each Tribe, and the name of the person approving the 2015 Compact on behalf of the Department of the Interior.

18.     A true and correct copy of the 2007 Compact between the Defendant Tribes and the State is attached hereto as Exhibit 1.

19.     A true and correct copy of the 2015 Compact between the Defendant Tribes and the State is attached hereto as Exhibit 2.

20.     On April 24, 2007, J. Robert Benavides, then Governor, for the Pueblo of Isleta executed the 2007 Compact between the Pueblo of Isleta and the State.

21.     On April 24, 2007, J. Robert Benavides had the authority to execute the 2007 Compact on behalf of the Pueblo of Isleta.

22.     On April 24, 2007, the State through then Governor Bill Richardson, executed the 2007 Compact between the Pueblo of Isleta and the State.

23.     Governor Richardson had the authority to execute the 2007 Compact on behalf of the State.

24.     On July 5, 2007, the Compact between the Pueblo of Isleta and the State was entered into the Federal Register, which enabled the Pueblo of Isleta to conduct Class III gaming in accordance with the 2007 Compact.

25.     The Pueblo of Isleta and the State entered into the 2015 Compact that was submitted for review by the Secretary of the Interior pursuant to IGRA on or about May 24, 2015.

26.     The Secretary of the Interior took no action on the 2015 Compact and thus it was deemed approved on July 21, 2015 by letter from Kevin Washburn, Assistant Secretary Indian Affairs.

27.     On April 24, 2007, Victor Montoya, then Governor of Sandia Pueblo executed the 2007 Compact between Sandia Pueblo and the State.

28.     On April 24, 2007, Victor Montoya had the authority to execute the 2007 Compact on behalf of Sandia Pueblo.

29.     On April 24, 2007, the State through then Governor Bill Richardson executed the 2007 Compact between Sandia Pueblo and the State.

30.     Governor Richardson had the authority to execute the 2007 Compact on behalf of the State.

31.     On June 18, 2007, the then Acting Principal Deputy Assistant Secretary of Indian Affairs,  approved and executed the 2007 Compact between the Sandia Pueblo and the State which enabled Sandia Pueblo to conduct Class III gaming in accordance with the 2007 Compact.

32.     The Pueblo of Sandia and the State entered into the 2015 Compact that was submitted for review by the Secretary of the Interior pursuant to IGRA on or about December 21, 2015.

33.     The Secretary of the Interior took no action on the 2015 Compact and thus it was deemed approved on March 2, 2016 by letter from Lawrence S. Roberts, Acting Assistant Secretary Indian Affairs.

34.     On April 24, 2007, J. Michael Chavarria, then Governor of Santa Clara Pueblo executed the 2007 Compact between Santa Clara Pueblo and the State.

35.     On April 24, 2007, J. Michael Chavarria had the authority to execute the 2007 Compact on behalf of Santa Clara Pueblo.

36.     On April 24, 2007, the State through then Governor Bill Richardson executed the 2007 Compact between Santa Clara Pueblo and the State.

37.     Governor Richardson had the authority to execute the 2007 Compact on behalf of the State.

38.     On June 18, 2007, the then Acting Principal Deputy Assistant Secretary of Indian Affairs,  approved and executed the 2007 Compact between the Santa Clara Pueblo and the State which enabled Santa Clara Pueblo to conduct Class III gaming in accordance with the 2007 Compact.

39.     The Santa Clara Pueblo and the State entered into the 2015 Compact that was submitted for review by the Secretary of the Interior pursuant to IGRA on or about July 20, 2015.

40.     The Secretary of the Interior took no action on the 2015 Compact and thus it was deemed approved on October 23, 2015 by letter from Kevin Washburn, Assistant Secretary Indian Affairs.

41.     On May 1, 2007, Ronald Montoya, then Governor of Santa Ana Pueblo executed the 2007 Compact between Santa Ana Pueblo and the State.

42.     On May 1, 2007, Ronald Montoya had the authority to execute the 2007 Compact on behalf of Santa Ana Pueblo.

43.     On April 24, 2007, the State through then Governor Bill Richardson executed the 2007 Compact between Santa Ana Pueblo and the State.

44.     Governor Richardson had the authority to execute the 2007 Compact on behalf of the State.

45.     On June 18, 2007, the then-Acting Principal Deputy Assistant Secretary of Indian Affairs,  approved and executed the 2007 Compact between the Santa Ana Pueblo and the State which enabled Santa Ana Pueblo to conduct Class III gaming in accordance with the 2007 Compact.

46.     The Santa Ana Pueblo and the State entered into the 2015 Compact that was submitted for review by the Secretary of the Interior pursuant to IGRA on or about October 25, 2016.

47.     The Secretary of the Interior took no action on the 2015 Compact and thus it was deemed approved on December 30, 2016 by letter from Lawrence Roberts Acting Assistant Secretary Indian Affairs.

48.     On April 24, 2007, Charles J. Dorame, then Governor of Tesuque Pueblo executed the 2007 Compact between Tesuque Pueblo and the State.

49.     On April 24, 2007, Charles J. Dorame had the authority to execute the 2007 Compact on behalf of Tesuque Pueblo.

50.     On April 24, 2007, the State through then Governor Bill Richardson executed the 2007 Compact between Tesuque Pueblo and the State.

51.     Governor Richardson had the authority to execute the 2007 Compact on behalf of the State.

52. On June 18, 2007, the then Acting Principal Deputy Assistant Secretary of Indian Affairs approved and executed the 2007 Compact between the Tesuque Pueblo and the State which enabled Tesuque Pueblo to conduct Class III gaming in accordance with the 2007 Compact.

53. The Tesuque Pueblo and the State entered into the 2015 Compact that was submitted for review by the Secretary of the Interior pursuant to IGRA on or about August 10, 2015.

54. The Secretary of the Interior took no action on the 2015 Compact and thus it was deemed approved on October 16, 2015 by letter from Kevin Washburn, Assistant Secretary Indian Affairs.

55. On April 24, 2007, Michael T. Sandoval, then Governor of the San Felipe Pueblo executed the 2007 Compact between the San Felipe Pueblo and the State.

56. On April 24, 2007, Michael T. Sandoval had the authority to execute the 2007 Compact on behalf of San Felipe Pueblo.

57. On April 24, 2007, the State through then Governor Bill Richardson executed the 2007 Compact between San Felipe and the State.

58. Governor Richardson had the authority to execute the 2007 Compact on behalf of the State.

59. On June 18, 2007, the then Acting Principal Deputy Assistant Secretary of Indian Affairs, approved and executed the 2007 Compact between the San Felipe Pueblo and the State which enabled the San Felipe Pueblo to conduct Class III gaming in accordance with the 2007 Compact.

60.     The San Felipe Pueblo and the State entered into the 2015 Compact that was submitted for review by the Secretary of the Interior pursuant to IGRA on or about January 6, 2016.

61.     The Secretary of the Interior took no action on the 2015 Compact and thus it was deemed approved on April 4, 2016 by letter from Lawrence Roberts, Acting Assistant Secretary Indian Affairs.

62.     In accordance with the New Mexico Gaming Compact Negotiation Act, the 2007 Compact between the State and the Tribes was approved by the New Mexico Legislature.

63.     The 2007 Compact contains no provision that expressly permits the use of Free Play credits by the Tribes.

64.     At the time the 2007 Compact was put into effect, none of the Tribes were giving Free Play credits to their patrons.

65.     At the time the 2007 Compact was put into effect, the Tribes were giving their patrons Free Play coupons that could be exchanged for money or tokens to be played in the Gaming Machines.

66.     At the time the 2007 Compact was put into effect, the Tribes were including the money or tokens exchanged for the Free Play coupons in the Net Win calculation.

67.     Sometime, in the period between 2008 and 2011, the Tribes began awarding patrons in their Player's Club programs Free Play credits, instead of giving patrons money or tokens for Free Play.

68.     The Tribes did not notify the State that they were changing the delivery method of Free Play to their patrons.

69.     The Tribes did not attempt to negotiate a change in Section 11 of the 2007 Compact when they changed the delivery method of Free Play to their patrons.

9

70.     When the Tribes began giving Free Play credits to their patrons they stopped including the value of the Free Play in the "Net Win" calculation.

71.     When the Tribes began the practice of excluding the value of the Free Play credits given to their patrons from the "Net Win" calculation they did not advise the State.

### 2007 COMPACT ONLY PERMITS DEDUCTION OF PRIZES WON USING MONETARY WAGERS

72.     Section 11 of the 2007 Compact is entitled "Revenue Sharing."

73.     Section 11.A of the 2007 Compact provides that a Tribe entering into that Compact agreed to "pay to the State a portion of its Class III Gaming revenues…," identified in and under the procedures set forth in Section 11.C of the 2007 Compact, in return for which the State agreed that such Tribe has the exclusive right within the State to conduct Glass III Gaming, subject to Section 11.D.2 of the Compact.

74.     Section 2 of the 2007 Compact defines Class III Gaming as all forms of gaming as defined in 25 U.S.C. § 2703(8) and 25 C.F.R. § 502.4.

75.     Section 11.B of the 2007 Compact provides that a Tribe that is a party to the Compact shall make the quarterly revenue sharing payments to the State provided for in Paragraph C of Section 11.

76.     Section 11.C.1 of the 2007 Compact defines the term "Net Win" as "the total amount wagered in Class III Gaming at a Gaming Facility, on all Gaming Machines less: (a) the amount paid out in prizes to winning patrons, including the cost to the Tribe of noncash prizes, won on Gaming Machines. **The phrase 'won on Gaming Machines' means the patron has made a monetary wager, and as a result of that wager, has won a prize of any value.** Any rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities, are not

deductible. The value of any complimentaries given to patrons, in any form, is not deductible….” (emphasis added).

77.     Section 11.C.2 of the 2007 Compact sets out the formula for calculating a percentage of Net Win that shall be payable to the State as revenue-sharing.

78.     Section 11.C.3 of the 2007 Compact requires Tribes that are parties to the 2007 Compact to make payments on a quarterly basis, no later than twenty-five (25) days after the last day of each calendar quarter, and shall be based upon the Net Win during the preceding quarter.

79.     Section 11.C.3 of the 2007 Compact provides, in pertinent part, that any payment or portion thereof that is not made within ten (10) days of the due date shall accrue interest at the rate of ten percent (10%) per annum, from the original due date until paid.

80.     Section 11.C.3 of the 2007 Compact requires that a Tribe accompany any payment to the State with a detailed breakdown of the particular obligation to which such payment applies, and the basis for the calculation of such payment.

## PUEBLO OF ISLETA

81.     The Pueblo of Isleta operates the Isleta Resort and Casino, formerly operated as the Hard Rock Hotel and Casino, and the Palace West Casino, both of which are located on Indian Lands within Bernalillo County, New Mexico.

82.     The Pueblo of Isleta’s Isleta Resort and Casino, formerly operated as the Hard Rock Hotel and Casino, and the Palace West Casino have a promotional program and Player’s Club program that includes the use of Free Play credits on Class III Gaming Machines at its casinos.

83.     The promotional program and Player’s Club, which is identified on the Isleta Resort and Casino’s website is called the Isleta Eagle Player’s Club.  When operating as the

Hard Rock Hotel and Casino the promotional program and Player's Club was called the Rock Star Club.

84.     By joining the Player's Club, patrons are eligible to be awarded Free Play credits on their Player's Club card.

85.     The Pueblo of Isleta through various marketing tools advises patrons of the opportunity to obtain, through marketing and other promotional activities, Free Play credits.

86.     Patrons of the Pueblo of Isleta who receive the Free Play credits are permitted by the Pueblo of Isleta to play such credits on Class III Gaming Machines up to the face dollar value of the Free Play credits.

87.     A patron of the Pueblo of Isleta using the Free Play credits plays the Class III Gaming Machine in the same manner as if the patron was using cash, or credits purchased with cash, or credits that may be redeemed for cash, to place a wager.

88.     A patron of the Pueblo of Isleta pays no cash or other monetary consideration to the Pueblo of Isleta in exchange for the Free Play credits.

89.     The Free Play credits awarded to a patron may not be exchanged for cash and are not otherwise able to be converted to cash.

90.     A patron of the Pueblo of Isleta is able to activate play on Class III Gaming Machines using Free Play credits only with the permissions granted by the Pueblo of Isleta.

91.     A patron of the Pueblo of Isleta is not permitted to keep a prize won on a Class III Gaming Machine using a slug, as defined by the Pueblo of Isleta's gaming regulations.

92.     A patron of the Pueblo of Isleta is not permitted to keep a prize won on a Class III Gaming Machine using a spooning device, as defined by the Pueblo of Isleta's gaming regulations.

93.     A slug is not a monetary wager when used on a Gaming Machine.

94.     A slug is not consideration for a prize won on a Gaming Machine.

95.     The use of Free Play credits is not a monetary wager when used on a Gaming Machine.

96.     When a patron is using Free Play credits to activate play on a Gaming Machine there is no monetary consideration paid for that play by the patron.

97.     In the event a patron of the Pueblo of Isleta is awarded a prize, jackpot or payout when using Free Play Credits to activate play on a Gaming Machine, the Pueblo of Isleta deducts the number of credits played from the balance of Free Play credits given to the patron, and the patron receives the same prize amount he or she would receive if the patron had placed a monetary wager.

98.     The Pueblo of Isleta has been deducting the value of the prizes, jackpots or payouts made by Gaming Machines in its casinos, from the "Net Win" and revenue sharing calculation, when a patron wins that prize, jackpot or payout using Free Play credits.

99.     The Pueblo of Isleta possesses all necessary data to determine the total amount of Free Play credits played on its Gaming Machines.

100.    The Pueblo of Isleta has the ability to determine the statistical percentage of prizes won as a result of the use of Free Play credits.

101.    The Pueblo of Isleta is subtracting the dollar amount of all prizes paid out on all Class III Gaming Machine play with Free Play credits when calculating "Net Win" and revenue sharing under the 2007 Compact.

102.    The 2007 Compact requires a patron to make a monetary wager, and to win a prize as a result of that wager, in order to deduct the prize for purposes of calculating "Net Win" and revenue sharing under the Compact.

103.    The 2007 Compact expressly prohibits the deduction of "[a]ny rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities," and further prohibits deduction of "[t]he value of any complimentaries given to patrons, in any form …."

104.    The Pueblo of Isleta's method of calculating "Net Win" results in the Pueblo of Isleta underpaying its revenue sharing to the State in violation of the 2007 Compact because the Pueblo is deducting the value of prizes awarded as a result of the use of Free Play credits for purposes of calculating "Net Win" and revenue sharing.

105.    The State has demanded that the Pueblo of Isleta pay to the State the full amount of underpaid revenue share payments and the accrued interest thereon.

106.    The Pueblo of Isleta has refused to comply with the State's demand and has, instead, persisted in distributing and awarding for redemption Free Play credits from the inception of its Free Play credits program through July 28, 2015 when the Pueblo of Isleta began operating under the 2015 Tribal-State Gaming Compact.

107.    By underpaying revenue share in the manner described above, the Pueblo of Isleta has breached the 2007 Compact and the State of New Mexico has suffered and continues to suffer economic loss.

## PUEBLO OF SANDIA

108.    The Pueblo of Sandia operates the Sandia Pueblo Resort and Casino located on Indian Lands within Sandoval County, New Mexico.

109.    The Sandia Pueblo Resort and Casino has a promotional program and Player's Club that includes the use of Free Play credits that can be used on Class III Gaming Machines at the casino.

14

110. The promotional program and Player's Club is advertised as the "Peak Rewards Club" on the Sandia Pueblo Resort and Casino's website and is a form of Player's Club.

111. By joining the Player's Club, patrons are eligible to be awarded Free Play credits on their Player's Club card.

112. The Sandia Pueblo Resort and Casino through various marketing tools advises patrons of the opportunity to obtain, through marketing and other promotional activities, Free Play credits.

113. Patrons of the Pueblo of Sandia who receive the Free Play credits are permitted by the Pueblo of Sandia to play such credits on Class III Gaming Machines up to the face dollar value of the Free Play credits.

114. A patron of the Pueblo of Sandia using the Free Play credits plays the Class III Gaming Machine in the same manner as if the patron was using cash, or electronic credits purchased with cash, or electronic credits that may be redeemed for cash, to place a wager.

115. A patron of the Pueblo of Sandia pays no cash or other monetary consideration to the Pueblo of Sandia in exchange for the Free Play credits.

116. The Free Play credits awarded to a patron may not be exchanged for cash and are not otherwise able to be converted to cash.

117. A patron of the Pueblo of Sandia is able to activate play on Class III Gaming Machines using Free Play credits only with the permissions granted by the Pueblo of Sandia.

118. A patron of the Pueblo of Sandia is not permitted to keep a prize won on a Class III Gaming Machine using a slug, as defined by the Pueblo of Sandia's gaming regulations.

119. A patron of the Pueblo of Sandia is not permitted to keep a prize won on a Class III Gaming Machine using a spooning device, as defined by the Pueblo of Sandia's gaming regulations.

120.    A slug is not a monetary wager when used on a Gaming Machine.

121.    A slug is not consideration for a prize won on a Gaming Machine.

122.    The use of Free Play credits are not a monetary wager when played in a Gaming Machine.

123.    When a patron is using Free Play credits to activate play in a Gaming Machine there is no monetary consideration paid for the play by the patron.

124.     In the event a patron of the Pueblo of Sandia is awarded a jackpot or payout when using Free Play credits to activate play on a Gaming Machine, the Pueblo of Sandia deducts the number of credits played from the balance of the Free Play credits given to the patron, and the patron receives the same prize amount he or she would receive if the patron had paid cash and placed a wager.

125.    The Pueblo of Sandia has been deducting the value of the prizes, jackpots or payouts made by Gaming Machines in its casinos, from the "Net Win" and revenue sharing calculation, when a patron wins that prize, jackpot or payout using Free Play credits.

126.    The Pueblo of Sandia possesses all necessary data to determine the total amount of Free Play credits played on its Gaming Machines.

127.    The Pueblo of Sandia has the ability to determine the statistical percentage of prizes won as a result of the use of Free Play credits.

128.    The Pueblo of Sandia is subtracting the dollar amount of all prizes paid out on all Class III Gaming Machine play with Free Play credits when calculating "Net Win" and revenue sharing under the 2007 Compact.

129.  The 2007 Compact requires a patron to make a monetary wager, and to win a prize as a result of that wager, in order for the Pueblo of Sandia to deduct the prize for purposes of calculating "Net Win" and revenue sharing under the 2007 Compact.

16

130.    The 2007 Compact expressly prohibits the deduction of "[a]ny rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities," and further prohibits deduction of "[t]he value of any complimentaries given to patrons, in any form …."

131.    The Pueblo of Sandia's method of calculating "Net Win" results in the Pueblo of Sandia underpaying its revenue sharing to the State in violation of the 2007 Compact because the Pueblo of Sandia is deducting the value of prizes awarded as a result of the use of Free Play credits in calculating "Net Win" for purposes of determining its revenue-sharing obligation to the State.

132.    The State has demanded that the Pueblo of Sandia pay to the State the full amount of underpaid revenue share payments and accrued interest thereon.

133.    The Pueblo of Sandia has refused to comply with the State's demand and has, instead, persisted in distributing and awarding for redemption the Free Play credits, from the inception of its Free Play credits program through April 4, 2016 when the Pueblo of Sandia began operating under the 2015 Tribal-State Gaming Compact.

134.    By underpaying revenue share in the manner described above, the Pueblo of Sandia has breached the 2007 Compact and the State of New Mexico has suffered and continues to suffer economic loss.

## SANTA CLARA PUEBLO

135.    Santa Clara Pueblo operates the Santa Claran Hotel and Casino located on Indian Lands within Rio Arriba County, New Mexico.

136.    The Santa Claran Hotel and Casino has a promotional program and Player's Club program that includes the use of Free Play credits on Class III Gaming Machines at the casino.

137.    The promotional program and Player's Club is advertised as the "More Rewards" program on the Santa Claran Hotel and Casino's website and is a form of Player's Club.

138.    By joining the Player's Club patrons are eligible to be awarded Free Play credits on their Player's Club card.

139.    The Santa Claran Hotel and Casino through various marketing tools advises patrons of the opportunity to obtain, through marketing and other promotional activities, Free Play credits.

140.    Patrons of the Santa Clara Pueblo who receive the Free Play credits are permitted by the Santa Clara Pueblo to play such credits on Class III Gaming Machines up to the face dollar value of the Free Play credits.

141.    A patron of the Santa Clara Pueblo using the Free Play credits, plays the Class III Gaming Machine in the same manner as if the patron was using cash, or electronic credits purchased with cash, or electronic credits that may be redeemed for cash, to place a wager.

142.    A patron of the Santa Clara Pueblo pays no cash or other monetary consideration to Santa Clara Pueblo in exchange for the Free Play credits.

143.    The Free Play credits awarded to a patron may not be exchanged for cash and are not otherwise able to be converted to cash.

144.    A patron of the Santa Clara Pueblo is able to activate play on Gaming Machines using Free Play credits only with the permissions granted by the Santa Clara Pueblo.

145.    A patron of the Santa Clara Pueblo is not permitted to keep a prize won on a Class III Gaming Machine using a slug, as defined by the Santa Clara Pueblo's gaming regulations.

146.    A patron of the Santa Clara Pueblo is not permitted to keep a prize won on a Class III Gaming Machine using a spooning device, as defined by the Santa Clara Pueblo's gaming regulations.

147.    A slug is not a monetary wager when used on a Gaming Machine.

148.    A slug is not consideration for a prize won on a Gaming Machine.

149.    The use of Free Play credits are not a monetary wager when played in a Gaming Machine.

150.    When a patron is using Free Play credits to activate play on a Gaming Machine there is no monetary consideration paid for that play by the patron.

151.    In the event a patron of the Santa Clara Pueblo is awarded a prize, jackpot or payout when Free Play credits are used to activate play on a Gaming Machine, the Santa Clara Pueblo deducts the number of credits played from the balance of Free Play credits given to the patron and the patron receives the same prize amount he or she would receive if the patron had paid cash and placed a monetary wager.

152.    The Santa Clara Pueblo has been deducting the value of the prizes, jackpots or payouts made by Gaming Machines in its casinos, from the "Net Win" and revenue sharing calculation, when a patron wins that prize, jackpot or payout using Free Play credits.

153.    The Santa Clara Pueblo possesses all necessary data to determine the total amount of Free Play credits played on its Gaming Machines.

154.    The Santa Clara Pueblo has the ability to determine the statistical percentage of prizes won as a result of the use of Free Play credits.

155.    The Santa Clara Pueblo is subtracting the dollar amount of all prizes paid out on all Class III Gaming Machine play with Free Play credits when calculating the "Net Win" and revenue sharing obligations under the 2007 Compact.

156.  The 2007 Compact requires a patron to make a monetary wager, and to win a prize as a result of that wager, in order to deduct the prize when performing the "Net Win" and revenue sharing calculation under the 2007 Compact.

157.    The 2007 Compact expressly prohibits the deduction of "[a]ny rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities," and further prohibits deduction of "[t]he value of any complimentaries given to patrons, in any form …."

158.    The Santa Clara Pueblo's method of calculating "Net Win" results in the Santa Clara Pueblo underpaying its revenue sharing to the State in violation of the 2007 Compact because the Santa Clara Pueblo is deducting the value of prizes awarded as a result of the use of Free Play credits for purposes of calculating "Net Win" and revenue-sharing.

159.    The State has demanded that the Santa Clara Pueblo pay to the State the full amount of underpaid revenue-share payments and accrued interest thereon.

160.    The Santa Clara Pueblo has refused to comply with the State's demand and has, instead, persisted in distributing and awarding for redemption the Free Play credits, from the date that it began the Free Play credit program through October 23, 2015 when it began operating under the 2015 Tribal-State Gaming Compact.

161.    By underpaying revenue share in the manner described above, the Santa Clara Pueblo has breached the 2007 Compact and the State of New Mexico has suffered and continues to suffer economic loss.

## SANTA ANA PUEBLO

162.    Santa Ana Pueblo operates the Santa Ana Star Casino located on Indian Lands within Sandoval County, New Mexico.

163.    The Santa Ana Star Casino has a promotional program and Player's Club program that includes the use of Free Play credits on Class III Gaming Machines at the casino.

164.    The promotional program and Player's Club program is advertised as a Player's Club on the Santa Ana Star Casino's website.

165.    By joining the Player's Club patrons are eligible to be awarded Free Play credits on their Player's Club card.

166.    The Santa Ana Star Casino through various marketing tools advises patrons of the opportunity to obtain, through marketing and other promotional activities, Free Play credits.

167.    Patrons of the Santa Ana Pueblo who receive the Free Play credits are permitted by the Santa Ana Pueblo to play such credits on Class III Gaming Machines up to the face dollar value of the Free Play credits.

168.    A patron of the Santa Ana Pueblo using the Free Play credits plays the Class III Gaming Machine in the same manner as if the patron was using cash, or electronic credits purchased with cash, or electronic credits that may be redeemed for cash, to place a wager.

169.    A patron of the Santa Ana Pueblo pays no cash or other monetary consideration to the Santa Ana Pueblo in exchange for the Free Play credits.

170.    The Free Play credits awarded to a patron may not be exchanged for cash and are not otherwise able to be converted to cash.

171.    A patron of the Santa Ana Pueblo is able to activate play on Gaming Machines using Free Play credits only with the permissions granted by the Santa Ana Pueblo.

172.    A patron of the Santa Ana Pueblo is not permitted to keep a prize won on a Class III Gaming Machine using a slug, as defined by the Santa Ana Pueblo's gaming regulations.

173.    A patron of the Santa Ana Pueblo is not permitted to keep a prize won on a Class III Gaming Machine using a spooning device, as defined by the Santa Ana Pueblo's gaming regulations.

174.    A slug is not a monetary wager when used on a Gaming Machine.

175.    A slug is not consideration for a prize won on a Gaming Machine.

176.    The use of Free Play credits is not a monetary wager when played in a Gaming Machine.

177.    When a patron is using Free Play credits to activate play on a Gaming Machine there is no monetary consideration paid for that play by the patron.

178.    In the event a patron of the Santa Ana Pueblo is awarded a jackpot or payout when using Free Play Credits to activate play on a Gaming Machine, the Santa Ana Pueblo deducts the number of credits played from the balance of the Free Play credits given to the patron and the patron receives the same prize amount he or she would receive if the patron had paid cash and placed a monetary wager.

179.    The Santa Ana Pueblo has been deducting the value of the prizes, jackpots or payouts made by Gaming Machines in its casinos, from the "Net Win" and revenue sharing calculations, when a patron wins that prize, jackpot or payout using Free Play credits.

180.    The Santa Ana Pueblo possesses all necessary data to determine the total amount of Free Play credits played on its Gaming Machines.

181.    The Santa Ana Pueblo has the ability to determine the statistical percentage of prizes won as a result of the use of Free Play credits.

182.    The Santa Ana Pueblo is subtracting the dollar amount of all prizes paid out on all Class III Gaming Machine play with Free Play credits when calculating the "Net Win" and revenue sharing calculation under the 2007 Compact.

183.  The 2007 Compact requires a patron to make a monetary wager, and to win a prize as a result of that wager, in order to deduct the prize for purposes of calculating "Net Win" and revenue sharing under the 2007 Compact.

184.    The 2007 Compact expressly prohibits the deduction of "[a]ny rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club

program (however denominated) or as a result of patron-related activities," and further prohibits deduction of "[t]he value of any complimentaries given to patrons, in any form …."

185.    The Santa Ana Pueblo's method of calculating "Net Win" results in the Santa Ana Pueblo underpaying its revenue sharing to the State in violation of the 2007 Compact because the Santa Ana Pueblo is deducting the value of prizes awarded as a result of the use of Free Play credits for purposes of calculating "Net Win" and revenue-sharing.

186.    The State has demanded that the Santa Ana Pueblo pay to the State the full amount of underpaid revenue-share payments and accrued interest thereon.

187.    The Santa Ana Pueblo has refused to comply with the State's demand and has, instead, persisted in distributing and awarding for redemption the electronic Free Play credits, from the inception of the Free Play credit program through December 30, 2016 when it began operating under the 2015 Tribal-State Gaming Compact.

188.    By underpaying revenue share in the manner described above, the Santa Ana Pueblo has breached the 2007 Compact and the State of New Mexico has suffered and continues to suffer economic loss.

## PUEBLO OF TESUQUE

189.    The Pueblo of Tesuque operates the Camel Rock Casino located on Indian Lands within Santa Fe County, New Mexico.

190.    The Camel Rock Casino has a promotional program and Player's Club program that includes the use of Free Play credits that on Class III Gaming Machines at the casino.

191.    The promotional program and Player's Club program is advertised as a Player's Club on the Camel Rock Casino's website.

192.    By joining the Player's Club patrons are eligible to be awarded Free Play credits on their Player's Club card.

193.    The Camel Rock Casino through various marketing tools advises patrons of the opportunity to obtain, through marketing and other promotional activities, Free Play credits.

194.    Patrons of the Pueblo of Tesuque who receive the Free Play credits are permitted by the Pueblo of Tesuque to play such credits on Class III Gaming Machines up to the face dollar value of the Free Play credits.

195.    A patron of the Pueblo of Tesuque using the Free Play credits plays the Class III Gaming Machine in the same manner as if the patron was using cash, or electronic credits purchased with cash, or electronic credits that may be redeemed for cash, to place a wager.

196.    A patron of the Pueblo of Tesuque pays no cash or other monetary consideration to the Pueblo of Tesuque in exchange for the Free Play credits.

197.    The Free Play credits awarded to a patron may not be exchanged for cash and are not otherwise able to be converted to cash.

198.    A patron of the Pueblo of Tesuque is able to activate play on Gaming Machines using Free Play credits only with the permissions granted by the Pueblo of Tesuque.

199.    A patron of the Pueblo of Tesuque is not permitted to keep a prize won using a slug, as defined by the Pueblo of Tesuque's gaming regulations.

200.    A patron of the Pueblo of Tesuque is not permitted to keep a prize won using a spooning device, as defined by the Pueblo of Tesuque's gaming regulations.

201.    A slug is not a monetary wager on a Gaming Machine.

202.    A slug is not consideration for a prize won on a Gaming Machine.

203.    The use of Free Play credits is not a monetary wager when played in a Gaming Machine.

204.    When a patron is using Free Play credits to activate play in a Gaming Machine there is no monetary consideration paid for that play by the patron.

205.    In the event a patron of the Pueblo of Tesuque is awarded a jackpot or payout when using Free Play credits to activate play on a Gaming Machine, the Pueblo of Tesuque deducts the number of credits played from the balance of the Free Play credits given to the patron and the patron receives the same prize amount he or she would receive if the patron had paid cash and placed a wager.

206.    The Pueblo of Tesuque has been deducting the value of the prizes, jackpots or payouts made by Gaming Machines in its casinos when a patron wins that prize, jackpot or payout using Free Play credits.

207.    The Pueblo of Tesuque possesses all necessary data to determine the total amount of Free Play credits played on its Gaming Machines.

208.    The Pueblo of Tesuque has the ability to determine the statistical percentage of prizes won as a result of Free Play credits.

209.    The Pueblo of Tesuque is subtracting the dollar amount of all prizes paid out on all Class III Gaming Machine play with Free Play credits when calculating "Net Win" under the 2007 Compact.

210.   The 2007 Compact requires a patron to make a monetary wager, and to win a prize as a result of that wager, in order for the Pueblo of Tesuque to deduct the prize for purposes of calculating "Net Win" and revenue sharing under the 2007 Compact.

211.    The 2007 Compact expressly prohibits the deduction of "[a]ny rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities," and further prohibits deduction of "[t]he value of any complimentaries given to patrons, in any form …."

212.    The Pueblo of Tesuque's method of calculating "Net Win" results in the Pueblo of Tesuque underpaying its revenue sharing to the State in violation of the 2007 Compact

because the Pueblo of Tesuque is deducting the value of prizes awarded as a result of the use of Free Play credits in calculating "Net Win" for purposes of determining its revenue-sharing obligation to the State.

213.    The State has demanded that the Pueblo of Tesuque pay to the State the full amount of underpaid revenue-share payments and accrued interest thereon.

214.    The Pueblo of Tesuque has refused to comply with the State's demand and has, instead, persisted in distributing and awarding for redemption the electronic Free Play credits, from the inception date of the Free Play credit program through October 23, 2015 when it began operating under the 2015 Tribal-State Gaming Compact.

215.    By underpaying revenue share in the manner described above, the Pueblo of Tesuque has breached the 2007 Compact and the State of New Mexico has suffered and continues to suffer economic loss.

## SAN FELIPE PUEBLO

216.    The San Felipe Pueblo operates the Casino Hollywood located on Indian Lands within Sandoval County, New Mexico.

217.    The Casino Hollywood has a promotional program and Player's Club program that includes the use of Free Play credits that on Class III Gaming Machines at the casino.

218.    The promotional program and Player's Club program is advertised as a Player's Club on the Casino Hollywood's website.

219.    By joining the Player's Club patrons are eligible to be awarded Free Play credits on their Player's Club card.

220.    The Casino Hollywood through various marketing tools advises patrons of the opportunity to obtain, through marketing and other promotional activities, Free Play credits.

221.    Patrons of the San Felipe Pueblo who receive the Free Play credits are permitted by the San Felipe Pueblo to play such credits on Class III Gaming Machines up to the face dollar value of the Free Play credits.

222.    A patron of the San Felipe Pueblo using the Free Play credits plays the Class III Gaming Machine in the same manner as if the patron was using cash, or electronic credits purchased with cash, or electronic credits that may be redeemed for cash, to place a wager.

223.    A patron of the San Felipe Pueblo pays no cash or other monetary consideration to the San Felipe Pueblo in exchange for the Free Play credits.

224.    The Free Play credits awarded to a patron may not be exchanged for cash and are not otherwise able to be converted to cash.

225.    A patron of the San Felipe Pueblo is able to activate play on Gaming Machines using Free Play credits only with the permissions granted by the San Felipe Pueblo.

226.    A patron of the San Felipe Pueblo is not permitted to keep a prize won using a slug, as defined by the San Felipe Pueblo's gaming regulations.

227.    A patron of the San Felipe Pueblo is not permitted to keep a prize won using a spooning device, as defined by the San Felipe Pueblo's gaming regulations.

228.    A slug is not a monetary wager on a Gaming Machine.

229.    A slug is not consideration for a prize won on a Gaming Machine.

230.    The use of Free Play credits is not a monetary wager when played in a Gaming Machine.

231.    When a patron is using Free Play credits to activate play in a Gaming Machine there is no monetary consideration paid for that play by the patron.

232.     In the event a patron of the San Felipe Pueblo is awarded a jackpot or payout when using Free Play credits to activate play on a Gaming Machine, the San Felipe Pueblo

27

deducts the number of credits played from the balance of the Free Play credits given to the patron and the patron receives the same prize amount he or she would receive if the patron had paid cash and placed a wager.

233.   The San Felipe Pueblo has been deducting the value of the prizes, jackpots or payouts made by Gaming Machines in its casinos when a patron wins that prize, jackpot or payout using Free Play credits.

234.   The San Felipe Pueblo possesses all necessary data to determine the total amount of Free Play credits played on its Gaming Machines.

235.   The San Felipe Pueblo has the ability to determine the statistical percentage of prizes won as a result of Free Play credits.

236.   The San Felipe Pueblo is subtracting the dollar amount of all prizes paid out on all Class III Gaming Machine play with Free Play credits when calculating "Net Win" under the 2007 Compact.

237.   The 2007 Compact requires a patron to make a monetary wager, and to win a prize as a result of that wager, in order for the San Felipe Pueblo to deduct the prize for purposes of calculating "Net Win" and revenue sharing under the 2007 Compact.

238.   The 2007 Compact expressly prohibits the deduction of "[a]ny rewards, awards or prizes, in any form, received by or awarded to a patron under any form of a players' club program (however denominated) or as a result of patron-related activities," and further prohibits deduction of "[t]he value of any complimentaries given to patrons, in any form …."

239.   The San Felipe Pueblo's method of calculating "Net Win" results in the Pueblo of Tesuque underpaying its revenue sharing to the State in violation of the 2007 Compact because the San Felipe Pueblo is deducting the value of prizes awarded as a result of the use of Free Play

credits in calculating "Net Win" for purposes of determining its revenue-sharing obligation to the State.

240.   The State has demanded that the San Felipe Pueblo pay to the State the full amount of underpaid revenue-share payments and accrued interest thereon.

241.   The San Felipe Pueblo has refused to comply with the State's demand and has, instead, persisted in distributing and awarding for redemption the electronic Free Play credits, from the inception date of the Free Play credit program through October 23, 2015 when it began operating under the 2015 Tribal-State Gaming Compact.

242.   By underpaying revenue share in the manner described above, the San Felipe Pueblo has breached the 2007 Compact and the State of New Mexico has suffered and continues to suffer economic loss.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

243.   The State incorporates by reference herein the allegations contained in paragraphs 1 through 193 as if set forth fully herein.

244.   The 2007 Compact, per Paragraph 11 required each Tribe to make quarterly payments to the State based on the requirements set forth in Paragraph 11.

245.   The amount in dispute with each Tribe is more than seventy five thousand dollars ($75,000).

246.   Each Tribe has failed or refused to pay the amounts due and continues to refuse to do so.

247.   By failing to pay the full amounts due, each Tribe has materially breached and repudiated the terms and conditions of its Compact.

248.    This action is expressly authorized by Section 7(B) and Section 9 of the 2015 Compact.

249.    The State is therefore entitled to an award of damages by this Court in an amount to be determined at trial, plus interest as allowed thereon.

## SECOND CAUSE OF ACTION

### BREACH OF CONTRACT

250.    The State incorporates by reference herein the allegations contained in paragraphs 1-199 of the Complaint as if set forth fully herein.

251.    Pleading in the alternative, to the extent that the Tribes aver or claim that Free Play credits constitute consideration or a monetary wager, the State avers that the Tribes have failed or refused to include the face value of such monetary wager in the computation of "Net Win" as required by Section 11 of the 2007 Compact.

252.    Section 11 of the 2007 Compact requires the inclusion of the total amount wagered which includes the use of Free Play credits in calculating Net Win.

253.    The Tribes include all Free Play credits, cash, earned cashable electronic free play credits and other types of electronic cashable credits in the amount wagered for purposes of calculating minimum payout percentage in Section 4.B.12 of the 2007 Compact.

254.    Any type of cash, electronic credits or cash equivalents that activate a Gaming Machine are included as "all amounts wagered" for purposes of determining minimum payout percentages for a Gaming Machine.

255.    The Tribes and Gaming Machine manufacturers do not use GAAP or the AICPA Gaming Guide for purposes of determining all amounts wagered for purposes of calculating minimum payout percentages.

256.   The Tribes include all cash and cash equivalents and all forms of electronic credits used to activate a leased Gaming Machine or wide area progressive Gaming Machine for purposes of performing "Net Win" and Gross Handle calculations for purposes of calculating payments to patrons and Gaming Machine manufacturers on wide area progressive Gaming Machines and leased Gaming Machines.

257   The Tribes do not use GAAP or the AICPA Gaming Guide for purposes of calculating Net Win to Patrons or the Gross Handle with respect to lease payments to manufacturers for wide area progressive Gaming Machines or leased Gaming Machines.

258.   With respect to wide area progressive Gaming Machines or leased Gaming Machines the Tribes and the Gaming Machine manufacturers set forth the formula for determining the Net Win in the leases, contracts or agreements.

259.   With respect to wide area progressive Gaming Machines or leased Gaming Machines the parties' leases, contracts or agreements do not include language that provides for the use of GAAP or the AICPA Gaming Guide in calculating Net Win or Gross Handle.

260.   For purposes of determining Net Win or Gross Handle under the terms of the leases, contracts or agreements for leased Gaming Machines or wide area progressive Gaming Machines, the Tribes do not utilize GAAP or the AICPA gaming guide method in performing the Net Win or Gross Handle calculation.

261.   For purposes of determining Gross Handle under Gaming Participation Agreements the Tribes have been required to use their slot accounting systems for purposes of determining all wagers accepted on the Gaming Machines that are the subject of the Participation Agreement.

262.     Net Win for purposes of Gaming Participation Agreements between the Tribes and certain manufacturers requires the inclusion of all wagers accepted by the Gaming Machines less jackpots.

263.     The Tribes utilize slot accounting systems or central monitoring systems to monitor and gather information related to wagers and payouts on each Gaming Machine in their casinos.

264.     The Tribes Gaming Machines and slot accounting systems or central monitoring systems each contain meters that identify the various types of wagers on Gaming Machines, including but not limited to monetary wagers and wagers using cashable and non-cashable electronic credits.

265.     The Tribes included Free Play in the "Net Win" calculation prior to 2008.

266.     Section 4.C. requires that the Tribes financial statements specify the total amount wagered in Class III Gaming on all Gaming Machines at the Tribes Gaming Facilities for purpose of calculating "Net Win" under Section 11 using the format specified in Section 11.

267.     With respect to Revenue Share payments, the 2007 Compact at Section 11.A requires that "the Tribe shall pay to the State a portion of its Class III Gaming revenues identified **in and under the procedures of this Section**,…." (emphasis added).

268.     Section 11.C is entitled Calculation of Payment Amounts.

269.     Section 11.C makes no reference to Section 4 of the 2007 Compact.

270.     Section 11.C does not state that GAAP is to be used for the purpose of determining total amount wagered.

271.     The Tribes have the total amount wagered on Gaming Machines in their slot accounting reports.

272.    The Tribes do not to use the data from the slot accounting reports for purposes of determining total amount wagered.

273.    The Tribes use the data from the slot accounting reports for determining the amounts wagered on Gaming Machines for purposes of determining "Gross Handle" or "Net Win" for purposes of  payments to patrons or lease payments to Gaming Machine manufacturers for wide area progressive or leased Gaming Machines.

274.    Section 11.C of the 2007 Compact does not permit the Tribes to deduct awards, rewards or prizes, in any form, received by or awarded to a patron under any form of player's club program.

275.    Only members of a player's club program are given or awarded electronic Free Play credits.

276.    The Tribes have been excluding or deducting the electronic Free Play credits awarded, given and used by patrons from the Net Win calculation set forth in Section 11.C of the 2007 Compact.

277.    The deduction or exclusion of electronic Free Play credits awarded, given and used by patrons who are members of the player's club program is expressly prohibited by the terms of Section 11.C.

278.    The drafters of the AICPA Gaming Guide are not parties to the 2007 Compact.

279.    The Tribes did not seek an amendment of the 2007 Compact to include the utilization of the GAAP or AICPA method in Section 11.C of the Compact.

280.    The AICPA Gaming Guide that addressed the treatment of electronic Free Play credits for purposes of the preparation of financial statements was not adopted until 2011.

281.     Prior to the 2011 adoption of the AICPA Gaming Guide, the Tribes were excluding the electronic Free Play credits or taking deductions for the electronic Free Play credits from the "Net Win" calculation and from their financial statements.

282.     The 2007 Compact, per Section 11, required each Tribe to make quarterly payments to the State based on the requirements set forth in Section 11.

283.     To the extent that the Tribes aver or claim that electronic Free Play credits are a monetary wager or consideration for a wager on a Gaming Machine, the Tribes have failed to include the face value of the wagers in the Section 11 "Net Win" calculation and/or are taking deductions for the credits awarded to patrons as part of their player's club program.

284.   Thus, the Tribes are wrongfully withholding the payments due to the State in breach and violation of the Compact.

285.     This action is expressly authorized by Section 7(B) and Section 9 of the 2015 Compact.

286.     The State is therefore entitled to an award of damages by this Court in an amount to be determined at trial, plus interest as allowed by law.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** the State asks that this Court enter judgment in its favor and against the Tribes and award the State monetary damages in an amount to be determined at trial, plus interest as allowed by law.

Dated: September 29, 2017          Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By */s/ Krystle A. Thomas*
    Nelson Franse
    Ed Ricco
    Krystle A. Thomas

34

P. O. Box 1888
Albuquerque, NM 87103
Telephone:  (505) 765-5900
FAX:  (505) 768-7395
nfranse@rodey.com
ericco@rodey.com
kthomas@rodey.com
*Attorneys for Plaintiff*